Welcome to Day 3 of the West Courtroom Panel. We have two cases to be argued this morning. First case up is Gabriella Ramirez-Ortez v. Barr. We have students who will be arguing with us this morning, so that's a good thing. All right, we're up. Ms. Brown, you're the first one. You're doing open. Good morning, and may it please the Court. My name is Claire Brown, and I'm a second-year law student at Texas A&M School of Law, here on behalf of our Immigrant Rights Clinic to represent the petitioner, Ms. Gabriella Ramirez-Ortez. Before we begin, we would just like to thank the Court for giving us the great opportunity to be here today. We are asking the Court to remand this case to the BIA for withholding of removal and protection under the Convention Against Torture for two main reasons. One, because substantial evidence does not support the BIA's conclusion of no past persecution, and two, because substantial evidence does not support their finding of no well-founded fear of future persecution. The record here does compel the finding of past persecution. To determine whether harm rises to the level of persecution, the BIA must consider the cumulative effect of all incidents involving physical and psychological harm, but here it completely failed to do so. It classified the attempted kidnapping, the attempted rape, and the assault with a deadly weapon of Ms. Ramirez-Ortez as merely a punch in the face. It did not consider the severity of the death threats that she received, and it did not consider the murder of her gay friend, Dennis, and it certainly did not consider the cumulative effect of all of these incidents together. What the BIA classified as a single physical altercation and punch in the face was actually an assault with a deadly weapon, an attempted kidnapping, and an attempted rape. One day when Mr. Ramirez-Ortez was walking home, Katara, who was a member of the violent MS-13 gang who had been threatening her for months, saw her and got out of his car, and while holding a gun in one hand, punched her in the face, grabbed her by the neck, tried to shove her into his truck, and told her that this is the day I am coming for you and that he was taking her with him to make it mine. And fortunately, she was saved from this by her gay friend, Dennis, who knocked Katara to the ground so that they could escape. But the BIA's reasoning behind its conclusion was that physical incidents resulting in minor injuries are insufficient to meet the requirement of past proceedings. Your Honor, I think you have a strong case on persecution, but what about her ability to relocate? She was able to do it at least twice. So, I mean, wouldn't that support the notion that she could safely relocate? Not necessarily, Your Honor. I mean, we go on a substantial evidence standard, so if there's substantial evidence to support the BIA's conclusion, then we have to defer to that. That's right, huh? Isn't that correct? Yes, Your Honor. But if this Court finds that she did experience past persecution, then the burden shifts to the government to prove that internal relocation is not reasonable or that there are changed country conditions. So if the Court agrees with us on our first issue, then they should still remand even if they think that internal relocation… Why wouldn't the finding of being able to relocate rebut the presumption? Well, the burden shifts to the government to prove that internal relocation is not reasonable. Correct, correct. But the BIA found that they had done that, didn't it? The BIA found that there was no finding of past persecution, and so the burden was still on the petitioner. But if this Court finds past persecution, then the burden shifts to the government. The BIA didn't make a finding on relocation? They did, Your Honor, yes. When the burden was on petitioner, they found. But that conclusion was not reasonable because while they did state that Mr. Miros-Ortiz was able to safely relocate to Elancho in the past, they stated that she was able to be there for multiple years when in fact she was only there for one year. But isn't the only evidence in the record about relocation that she lived in Elancho without any disruption for a year, but the only reason Ramirez-Ortiz, only Katara was able to find her, was that she went back to her old town? So there's no indication in the record that if she stays in the new town that somebody is going to come after her, is there? Well, we know that while she was in Elancho, Katara was still looking for her and he was still harassing her mother and her niece. And what the BIA failed to consider is that she was able to avoid Katara for one year from January 2015 to 2016, but that was before the threats from him began to escalate, before the assault and before Dennis's death. And so while she was able to avoid him for a year at that time, that does not prove on its own that she would be able to avoid him in 2019 and onward. But there's no evidence in the record the other way, except that maybe he was searching for her? Is that in the record? Yes, Your Honor, he was searching for her. Beyond the town where she was living? Beyond her hometown? Yes, he was looking for her and he was, at one point she did change her phone number, but he was able to get her new phone numbers from someone. And he continued to look for her even after her, after she fled, there's evidence in the record that he still went to her home to look for her. She spoke to her friend Dennis at one point and he told her not to come back because Katara was angry and was looking for her everywhere. You seem to be attributing the murder of Dennis to Ramirez-Ortiz and the situation, but there's nothing actually in the record that that's the source, the identity of the men who killed Dennis, is there? There is evidence in the record that Katara was the one who sent the men to kill Dennis. Where is that? That is on page 204 of the record, is a statement from Dennis' mother, and she was unfortunately present at the time of Dennis' murder. And in that statement, she says that before they killed Dennis, they told him that they were killing him because he had protected Mr. Ramirez-Ortiz. Right, but it doesn't say he was threatened, he says he was threatened for having intervened for Ramirez-Ortiz, but it doesn't reveal the identity of the men or link them to Katara. Well, during the physical assault between Katara and Mr. Ramirez-Ortiz, Dennis was the one who came to save Mr. Ramirez-Ortiz, and so Katara would have, and Mr. Ramirez-Ortiz and Dennis would have been the only ones who knew about that incident. And there isn't anybody else who had been protecting Mr. Ramirez-Ortiz, and so that those two gang members knew that Dennis had protected her in the past points to finding that it was Katara who sent them. As to whether Katara had influence over the police, your position is not that the police themselves will persecute your client, is it? That was not advanced before the BIA. That specific argument was not advanced before the BIA, but the requirement to exhaust all administrative remedies applies to claims or issues, and the overall issue of well-founded fear of future persecution was brought up before the BIA. Right, but it's not from the police. It's from Katara through monetary influence over the police, right? We also believe that there is a risk of harm by the government itself. Well, that's not before – you can't raise arguments that weren't raised before the BIA here, can you? I believe you can, Your Honor. This is not a different claim or issue. It's just a different argument, and the evidence is in the record to support that there would be harm by the government. As to whether Katara had influence over the police, what do you make of your client's own testimony that she did not know whether Katara had actually paid the police? I think that there are other ways – other evidence in the record that also shows that he had control over the police or that the police were working with him. We know that after the assault, Mr. Ramirez-Ortiz and Dennis went to file the police report at a station in their town, but those police turned them away and made them go to a different police station. And then those – the first police actually notified Katara that Mr. Ramirez-Ortiz had filed a police report, but they took no steps to protect Mr. Ramirez-Ortiz. And we know that it was the police who notified him because Dennis and Mr. Ramirez-Ortiz did not tell anyone that they had filed a police report because she was very afraid of Katara. How much education did Gabriella have? She went through high school. She seemed to get jobs pretty easily. She moved a couple of places, at least two places, and was able to get a job, was she not? Yes, Your Honor. What kind of work did she do? She worked in hotels, and when she was on a luncheon, she worked on the ranch. Okay. So how far away from her home did she move? She moved somewhere for a year. How far was that from her home? I believe that it was a few hours away. I'm not positive exactly how far away it was, but Honduras is overall a pretty small country, so it wouldn't have been too far. And when considering internal relocation, the BIA also applied the wrong legal standard and committed both a legal and factual error when it failed to consider all of the relevant factors in assessing the reasonableness of internal relocation. The regulation provides that to determine reasonableness, adjudicators should consider a number of factors, but the BIA here never cited to the portion of the record or to the portion of the regulation that outlines the factors to consider. The only factor they made any attempt to consider was whether she would face harm in the place of suggested relocation. And it failed to consider the ongoing civil strife within Honduras or the discrimination against LGBT persons, even though there is evidence in the record that documents this discrimination and the increased hardships for LGBT persons. And it did not consider social and cultural constraints like her age, gender, and social and familial ties. Counsel, are you, we have had at least unpublished cases that have said that, which are persuasive but not authoritative in our circuit, that have said if you can move for four months, relocation is not unreasonable. In seeing these sessions, for example, are you aware of any of our case law that would say that even a year would not be enough to establish that relocation is good enough? No, Your Honor, I'm not aware of any specific cases that state that. I also think that it's not only that she was only there for a year, it was also that the year she was there was before the threats from Qatar started to escalate and before he got really angry and before he assaulted her and killed her friend Dennis. Counsel, can you address our case law in Edouard that says a single physical altercation doesn't rise to the level of persecution? And that's even if there are threats, just because there's threats and then there's a physical altercation doesn't mean that that's persecution. It has to be that the, what results is of a, like in the Tamara Gomez situation. So why doesn't Edouard halt your claim? Well, in Edouard, the assailant was an unknown assailant. While here we know that the same person, Katara, who was threatening her is a person who was behind the assault. And in Edouard, he was only subject to general harassment. But here we know that Mr. Ramirez-Ortiz received very specific death threats from Katara that escalated over time. For instance, he threatened to cut off the heads of both her and her girlfriend and send those severed heads to their families. And he told her that he would rather see her dead than with a woman. And he threatened that if she told anyone he was threatening her, he would come to her house and shoot her in the head. Which is clearly much more than general harassment and makes this case very similar to Tamara Gomez. Because, and this case is actually more persuasive than Tamara Gomez because there the petitioner did not experience any physical harm. But here we have very serious death threats by someone who has the ability to carry them out. And we also have physical harm to Mr. Ramirez-Ortiz. Well, in Tamara Gomez, they had actual people killed. Here, yes. Similarly situated. The record here points to that Katara killed Dennis who, as a gay man, is similarly situated to Mr. Ramirez-Ortiz. Thank you. All right. Thank you for helping. Your side has rebuttal reserved. Let's hear from the government. Mr. Hayes. Good morning, Your Honors. Timothy Hayes on behalf of the Attorney General. Petitioner seeks review of a decision of the board denying her application for withholding of removal to Honduras. While this petition was pending, she was removed to Honduras when the court didn't grant her a stay of removal. She subsequently attempted to legally re-enter the United States on a United States passport, not her own. This intervening event has caused this petition to become moot, and the court should dismiss review of it. An appeal is moot when, by virtue of an intervening event, a court of appeals cannot grant any effective relief. Is that addressed extensively in your brief? This happened after briefing, Your Honor. But you didn't file a 28-J or anything to say you were going to come and make a brand-new argument today about mootness? It's in our renewed stay opposition, Your Honor. I'm happy to supplement a brief, Your Honor. That still doesn't answer the question of you blindsiding us straight out of the mic with a mootness argument, no matter where else it might be buried, because that's what your principle relies on. That's just not a good thing. I apologize, Your Honor. For the government or anybody else, probably less so for the government. Well, I apologize, Your Honor. I did attend to file a formal motion to dismiss, and I wasn't able to get to it. Apologies only carry you so far. We've got a well-entrenched rule. We wouldn't let them bring up something at the last minute. Is the opposing side aware that you're coming in on mootness? Yes, Your Honor. We've discussed this, Your Honor, and we've talked about supplemental briefing. Yeah, but let's back up, counsel. I apologize. The thing is, before a panel, we've read all this material and geared up for the argument, and then here, straight off the bat, you come in saying intervening events have made this moot, and that was not teed up to us. Back up a step and explain to us what we decided what to do with it, whether that you argued it or not. What is it again has occurred you say now makes this appeal moot? Your Honor, Ms. Ramirez was removed to Honduras while this petition for review is pending. She then attempted to unlawfully re-enter the United States, presenting a passport not her own. She has been convicted on misuse of identification documents in the District of Arizona. After she was convicted. When did the conviction occur? October of 2018, Your Honor. After the conviction occurred, she expressed a credible fear of returning to Honduras. My understanding is it's based a lot on these events. She was referred to an asylum officer who found that she had a credible fear, and that caused her to be placed in full-blown removal proceedings. So in removal proceedings, she's actually eligible to apply for asylum, in addition to withholding a removal and protection under the conviction of torture. And right now, she has a hearing before an immigration judge this Friday to file that application. I'm not sure when the application will be fully adjudicated, but there are ongoing removal proceedings involving this individual at this time. But as a matter of law, you can't get withholding of removal if you have a criminal, this type of injury. Is that your position? That's what makes the issue so complicated, Your Honor. And again, I apologize. You're absolutely right. I should have put all this in writing. A reinstated order of removal, you're only eligible for withholding. And what the Court has before it right now is she was originally ordered removal under an expedited removal order in 2014, which was executed in 2015. She legally reentered, and they reinstated that prior order. That's what's before this Court right now. And she expressed a fear, and under the reinstatement procedure, she's only eligible for withholding. Her fear was found reasonable by an immigration judge. She was put in withholding-only proceedings, and that's what's before this Court right now. But aren't you ineligible for withholding of the reinstated removal if you have a criminal? We had one of these recently where the person becomes ineligible as a matter of law because of this subsequent criminal conduct. I'm sorry. I didn't mean to cut you off. I apologize. Yes, Your Honor, but that's only if the DHS actually reinstates the removal order. Here, the DHS tried to issue what was called another expedited removal order, which occurs when people come to the border and either don't have proper entry documents or, in this case, make a false claim of citizenship. So even though she previously had a reinstated order of removal, she can actually apply for asylum. It's a loophole in the law where you can come back and apply for asylum at the border. But that's in the new proceeding. Yes. That's new before us. Right, Your Honor. But do we have any – can we give relief? Exactly. I don't think we can give relief if there is an intervening criminal as a matter of law. Well, no, I don't believe as a matter of law because technically the immigration judge could grant her asylum or withholding of removal in these new proceedings. But that's in the new proceedings. It's in these – with what we have here, and we only have the intervening incident, if they already had a – well, I don't know. This would have been helpful to have briefed because we've had this on other cases. It is very complicated. And withholding of removal is very technically difficult for them to get whenever you have intervening criminal conduct. So after it's been reinstated. Well, I don't know if – I don't want to speculate. I don't know – I do know that she was charged in removal proceedings with making a false claim to citizenship, and that was sustained. So ultimately she can still apply and receive asylum, though, even with that. But that's a different product for a different day, not – we don't have jurisdiction over that. Right. At least at this time, no. But – Was she removed after she – I think she served a sentence for using a false passport, didn't she? She was – I think it was time served. While it was all queued up, it took about 90 days for it to – And then she was removed? No, she's still here, Your Honor. And that's part of the mootness argument. I mean, even if the court were to agree and grant withholding of removal, it wouldn't change anything in this case because she's already here, and she's actually in proceedings where she can apply for asylum, which is a greater form of relief than what's before the court today. So she – is she being held? Is she being held? Right now, yes. She's in detention. She's in Louisiana. In Louisiana detention, and she has been ever since she got time served? Right. Time served? Well, she did – Using a criminal document? It was a 94-day sentence, and she was credited for it. That was in Arizona, huh? Yes, Your Honor. Yeah, and I actually – I didn't know about it until very late in the process. And so it's been a mess. And then besides the mootness issue, even if it wasn't technically moot, we would argue prudential exhaustion reasons. The court should hold its hand until those proceedings are completed. But I will address the merits of this actual case as well. Does the merits of this case have any bearing? If we determine that she could – that the evidence supports that she could relocate, does that matter? I don't believe so, Your Honor. And the reason being is there is a new record being created in these new proceedings. So it ostensibly is going to encompass events that have occurred after her removal and prior to her illegal reentry into the United States. Even if we make a ruling, it won't have any bearing. Exactly. They can ignore our ruling about whether she can safely relocate or whether she was persecuted in the past? I don't think they can ignore it, Your Honor, but new evidence can come to light that might change the basis for that ruling. I mean, the court would have to – even if the court ruled as a matter of law, the law is based on facts. And if the facts are different, then it's going to change the calculus. How would the facts be different if it's in the past about past persecution? Well, that's true, Your Honor. But there are possibilities with past persecution where the – that's true, Your Honor. So, for example, assuming the record compels the conclusion that she was persecuted in the past, the alien is entitled to rebuttable presumption of future persecution. But even if the court were to make that finding, the government could rebut that based on evidence that has occurred subsequent to her removal. So you don't want to win today if you could win. You just want us to do nothing, is that correct? That's right. What if you don't even want to argue that you could win? That's – it's a mootness issue, Your Honor. What if we disagree with you that it's moot? Then for prudential exhaustion reasons, you should hold your hand until the other case is played out. Well, should we rule for the other side? Well, if you ruled for the other side, there was no live case or controversy at this point. So it would be moot. You're not going to address whether she can relocate? I would. Which is what you briefed. I would be happy to address it, Your Honor. I mean, this all happened after briefing. So, like I said, I wasn't aware of it until probably December, December of 2018. And this is April? Yes, Your Honor. And, I mean, I know we had a government shutdown, but it wasn't that long. It was five weeks. Right, which is not – still left you months to do this. Well, we should have filed something more than our renewed stay opposition. And I do apologize, Your Honor. But, like, what about yesterday? I mean, this is Wednesday. The panel has been sitting since Monday. The case has been on the docket. And I think, don't we have a motion to stay? And our opposition to that motion weighs out our mootness argument. We attach the exhibits to all of what's going on. I understand. In retrospect, I totally understand, Your Honor. We didn't rule on the motion to stay. We carried it with the case because we were going to have arguments on the whole, you know, smeal based on the motion to stay. So, well, I suggest you just address everything while you're here. Okay. Thank you. Because, obviously, we're going to have to have some filings and determine what to do. Thank you, Your Honors. And, like I said, I'd be happy if the court would like supplemental briefing. I'd be happy to provide that. Well, it's not so much whether we would like to have it, but if you're coming in with a lights out argument, don't you think from the government's standpoint it's compelled that you, you know, bring the court absolutely up to date on the status, especially if we're talking jurisdiction, mootness, et cetera? Yes, Your Honor. And the proper way of doing that would have been a formal motion. You're right. And it's not even clear that it's technically moot. You're just saying prudentially it's a waste of our time. Well, we're arguing both. It's an Article III mootness. Well, I said that it's not clear that it is. Right, right. Yes, Your Honor. They may be arguing that on the fly here, but it's not an easy issue of Article III mootness. No, it's not. And so that's a hard question. And then your prudential, we may not want to do. Right, right. You're absolutely right, Your Honor. Does the substantial evidence support the BIA's finding of past persecution? Yes, Your Honor. Why? What we have in this case is a threat that, well, a multitude of threats that rose to a single physical altercation involving a person by the name of Katara. And the altercation involved her being punched in the face. While that's reprehensible, that is insufficient to rise to the level of persecution. And it doesn't compel the conclusion under this Court's case law. It's the best case for that, Edward. That is the best case, Your Honor. Well, we had all the threats and then the murder of her friend. Well, Your Honor, I assume you're talking about Dennis, correct? Yes. The immigration judge did not find sufficient evidence to tie that murder to her. Now, it would be a different case if he was ‑‑ if it was very explicit that he was harming Dennis to harm her. But he was ‑‑ the evidence suggests that he was harming Dennis as a result of his intervening and making him look bad. That actually totally changes the calculus and makes this a different case. So the agency did not find sufficient evidence for that to be involved in the past persecution. It's hard to tie it to it, though, isn't it? Well, in a but‑for causation way, I would agree, Your Honor. If he wasn't there to intervene, then he might not have been harmed. Who knows? But it wasn't enough in a legal kind of asylum sense. And the case for that is a matter of AK, which suggests that in order to be harmed yourself through other people, the person has to want to harm you harming that other person. It certainly shows how serious he was about getting to her. True. But, again, it's ‑‑ there are two issues with that evidence. One is the mother's letter ‑‑ well, I should step back a second. The biggest issue the immigration judge made out of all that is if Katara wanted to hurt Dennis, he could have done so himself. He encountered Dennis numerous times after the single physical altercation, and he was looking for Ms. Ramirez, but he did not harm her. So to the immigration judge's mind, that was a big kind of question. And then you pair that with the fact that the mother's letter suggests he was harmed by two individuals. They didn't mention Katara. And you don't have sufficient evidence in the record to compel the conclusion that that was tied to her. And I think that that's kind of what the agency was getting at, and that's certainly what the immigration judge was getting at in that case. Switching gears to the well-founded fear of future persecution, the agency held that she did not show an inability to internally relocate to avoid harm. Now, when there's no finding of past persecution and the persecution isn't government‑sponsored, the burden is on the alien to show that it would not be reasonable for her to relocate, and she has not met her burden here. If we were to find that she had met her burden, would we have to remand for the BIA to weigh it under the correct standard where the government would bear the burden about establishing relocation, or could we on this record say the record overwhelmingly shows that she was able to relocate under our case law? That's a good question, Your Honor. It actually depends on exactly how the court rules. If the court were to rule that past persecution is compelled in this case, then it would have to go back to the agency because, as prior counsel was saying, the presumption switches. Right, but you don't think the evidence is overwhelming, so it doesn't matter which way the presumption is? Well, I suppose if the court were to say that the evidence compels the conclusion that under any standard internal relocation is not reasonable, then you'd have a good idea. You could do that, or you could remand for the court to determine in the first instance, for the BIA to determine in the first instance using the correct standard. Right, but they did use the correct standard. If there's a finding of past persecution. That's right, Your Honor. The burden shifts. Yeah, and so they could either re-weigh it or else the court could determine if the evidence would weigh it. Right, well, we would absolutely advocate weighing because then DHS might want to shoulder some additional evidence because of burden of shift announced on DHS. Is the easiest way to resolve this case now in a way that's consistent with both what you're seeking and they're seeking to grant the stay? It wouldn't matter. Or it doesn't really matter and we could stay everything? Right, because right now she's before the agency, so they can't remove her. The only way they would be able to remove her is— The stay doesn't matter at all anymore. They're posing counsel shaking their head to the contrary, but I guess he'll address it when he gets up here. Yeah, but touching on relocation— Let me ask you, this is just a policy of the agency or is there some rule that would prevent removal without a stay? It's the regulations, Your Honor. Before the board issues a decision—well, it depends. But while the case is before the immigration judge, DHS cannot remove an individual. Once the immigration judge rules and if he finds—issues a removal order, there's a period where they can remove her. But if they seek an appeal with BIA, there's automatic administrative stay by the regulations. So it's just the way the process plays out. Now, if the board were to affirm a removal order, then she would have to petition this court for review and seek a stay from this court in order to get a stay. But we're not at that point with the proceedings below. She's still before an immigration judge. Just because it's on review to our court, they can remove her without—if we don't enter a stay, right? If the Board of Immigration Appeals were to affirm the removal order and she didn't petition and file for an emergency stay, that's correct. Yes, Your Honor. Switching back to internal relocation, the board rested its decision on the fact that she was able to work in Alancho and going on weekends to Tella to work at a hotel for, I believe, 13 months without incident. And to answer Your Honor's question, I believe she said in the record that the distance was two hours by car and three hours by bus, the distance between her hometown and Alancho. And then as far as that regulation, the regulation says should consider. It doesn't say must consider or shall consider. There is no law that says each one of the factors in the regulation has to be discussed by the agency before it determines that relocation is not reasonable. And finally, as far as the Convention Against Torture application, the police accepted a police report on Gattaro. And there are numerous instances in the record where the police actually did confront him and was trying to investigate and was telling him to leave her alone. So there isn't sufficient evidence in this case to compel the conclusion that there's governmental acquiescence as far as a protection against Convention Against Torture. What happened on the murder, Dennis's murder? I don't know, Your Honor. There's no evidence in the record beyond the mother's statement that her son was murdered. There's nothing in the record. And she wasn't able to testify to that. No police record of it? No. There is a police report in the record, but that's a report she actually filed against Gattaro where it discusses her and Dennis's encounter with Gattaro. Counsel, the murder under the findings that the immigration judge made can't be considered, can it, under our precedent in Kane? Right. That's right, Your Honor. And when I'm saying matter of AK, this court affirmed that in Kane. Kane v. Holder says that you can't consider that murder if they found that it wasn't sufficiently linked. And that's our whole argument, Your Honor. Yeah, that's the main point of why it's not enough without the murder and the murder can't be considered. That's absolutely correct, Your Honor. On the issue of is she in a social group, though, is it even clear in the record that she's a member of a particular social group? Well, we can't really, I can't really address that because she made a variety of arguments to the immigration judge, and the immigration judge made rulings. The board elected not to reach that. The board assumed all that in her favor. So we would have to send that back if we had questions that she would qualify for social group. Well, in order to send it back, it would have to be more than questions at that point. You'd actually have to reverse. Reverse and say that there's still pending. Even if she were to win, that it looks like there's persecution, but it's not clear on the record as to this. We need to remand back for you to determine whether or not there is a social group because the social group standards have changed, and we haven't adopted the D.C. District Court's rules about that either. Right. That's still very much in FOX. Yes. But it would have to be remanded. Oh, I'm sorry. I didn't realize I was out of time. I apologize. Well, considering the way you laid this out, that's not surprising. We'll hear from the other side on rebuttal, but you need to file something soon. I will. Do you have a particular format you would like me to motion to dismiss? Well, I mean, you're urging that it's moot, right? So I suggest you formalize what you've orally stated, whatever the current government position is, i.e., we've got a pending motion to stay that we carried with the case. That's in front of us. You've urged that intervening events, you know, have made moot. You've not, in I think response to Judge Odo's question, not clear whether you're saying it's straight on Article III moot or whether there are potential aspects of it to be considered. So you kind of need to stretch out exactly what the position is so that we can allow the other side to respond and then we can determine from there what, if anything, we need to do with the merits of this case or whether we're staying at all or whatever. I mean, it's literally presented to us in the first instance. So, you know, it's a totally different case. Okay, Your Honor. I'll do that immediately. All right. Thank you. Well, let me put it this way. I shouldn't throw it out quite that way because I don't want you to just throw something up here. I don't suggest you would, but, you know, how much time do you need? A week? Ten days? A week would be plenty, Your Honor. All right. Okay. From a day, you've got a week to file whatever you're filing, and then we'll give the other side seven days thereafter to respond to it, and we'll go from there. Okay. Thank you, Your Honor. All right. Thank you. All right. Rebuttal. Before you get into the meat of what you were going to say, so counsel has indicated to us that you all were aware that this position of the government that the matters are moved because of intervening events. You were aware of this before today? Yes, Your Honor. Okay. Via the motion for stay brief, we had a little bit of time to look into this. Before I address the government's arguments on mootness, excuse me, Matthew Smith, also a petitioner. Good morning. I'd like to address a few small points. The IJ and the BIA did not consider or even acknowledge in their decisions the letter from Dennis' mother about the murder. And as a result, they didn't fully consider the record on that issue, and that's important because this event, I mean, it is linked to Ms. Ramirez-Ortez, and it's sufficiently linked beyond the standard of the can beholder. It's very important to consider in the argument of past persecution. As to Judge Davis' question about internal relocation, this is a small country. This is a country that is smaller than the state of Louisiana, and she has already tried to internally relocate. She went to the city of Tellah, which is, as the government mentioned, about two to three hours away by car. And she moved in with her girlfriend. This is a city of 100,000 people. And Katara was able to find her girlfriend's home address. This is on page 143 of the record. In fact, one day when Ms. Ramirez-Ortez took a walk on the beach with her girlfriend and she kissed her partner, and Katara called her up almost immediately and told her he saw her kiss her girlfriend, which means one of two equally horrifying things. Either he drove the two to three hours to Tellah, found her. But didn't she go home before he found her? She went home intermittently to visit her mother. So, I mean, again, it's speculation, but it's very possible that he followed her on a trip back to Tellah from her hometown. But she lived primarily in Tellah for a period of time with her girlfriend until it was clear that Katara had found her and was making threats against her and her girlfriend. And Ms. Ramirez-Ortez knew that she had to break off the relationship. So it's not clear where she's supposed to go in this country. We know that a mountainous region like Olancho is unrealistic as well. I mean, she doesn't have any more mountain-dwelling family members, and her uncle sold that ranch. As resourceful as Ms. Ramirez-Ortez is, she has survived in this country as a single young gay woman in a country where it is dangerous to be so as a result of her family connections. And this was before Katara had resorted to violence, but now Katara has resorted to violence and she has no more safe havens left. On to the issue of the government address mootness here. This case is not moot for a number of reasons. This case will have an effect on her life no matter what. The first reason it's not moot is because there's a deportation order that was associated with this case before the court that triggered a 20-year bar of admissibility into the country. So even if she wins her new immigration proceedings, she has a 20-year bar to become a permanent resident. If she loses those immigration proceedings and she gets deported, she has a 20-year bar to come back into this country or even visit. This court has held in a couple of different cases, including that of Zalewadia v. Ashcroft in 2004, that a bar to readmission is a legally cognizable stake in a case that defeats mootness. Alternatively— But shouldn't she have the 20-year bar anyway? Because it's driven by her illegal conduct, not by— the 20-year bar should be there regardless of whether or not she should have been entitled to withholding. Ms. Ramirez-Ortiz has a number of different options here. She can request a waiver for a 20-year bar. This is an exercise of discretion. But our ruling here wouldn't stop that. The ruling here could definitely change the minds of the people who are making the call on whether or not Ms. Ramirez-Ortiz would get a waiver for the 20-year bar or any kind of bar that she may face in the future. Alternatively, I have 10 seconds left. There's also this line of thought that might be capable of repetition yet evading review, and we think this is such a case and we'd be happy to supplementary brief the Court on that argument. Thank you. All right. Thank you. Thank you for the briefing and the argument, and thank you to counsel and for the students. Both of you handled yourself quite well in the briefing and very poised at the podium. We have some seasoned lawyers who sometimes shiver at the podium or otherwise not able to get a grip on the Court's questions, so we applaud you for your ability to handle and to counsel and appreciate your presentation to the Court, and good luck to you. Maybe we'll see you again in a different state. All right. That's it. The case will be submitted.